# Illinois Official Reports

## Appellate Court

---

### *In re M.P.*, 2020 IL App (4th) 190814

---

| | |
|---|---|
| Appellate Court Caption | *In re* M.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. M.P., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0814 |
| Filed | April 2, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 19-JD-88; the Hon. Jason Chambers, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Sheril J. Varughese, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices DeArmond and Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1 The trial court adjudicated respondent, M.P. (born July 13, 2002), delinquent of three counts of robbery (720 ILCS 5/18-1(a) (West 2018)). Pursuant to section 5-815 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-815 (West 2018)), the court also determined that he was a habitual juvenile offender and ordered him committed to the Department of Juvenile Justice (DJJ) until his twenty-first birthday. Respondent appeals, arguing (1) his attorney was ineffective for failing to seek suppression of statements he made to the police on the basis that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and (2) he did not knowingly waive his right to a jury trial because the court failed to admonish him of the penalties he would face upon adjudication as a habitual juvenile offender. We affirm.

¶ 2                                                    I. BACKGROUND

¶ 3 On August 5, 2019, the State filed a petition for adjudication of wardship, alleging 17-year-old M.P. committed three counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2018)). It asserted that, on or about July 22, 2019, respondent (or one for whose conduct he was legally responsible) knowingly took money and property from the victim, Savion Haywood, while armed with a firearm. The State also filed a notice of intent to prosecute respondent as a habitual juvenile offender under section 5-815 of the Act (705 ILCS 405/5-815 (West 2018)) based on his history of juvenile delinquency.

¶ 4 On August 9, 2019, the trial court conducted a hearing and admonished respondent regarding the effect of a habitual juvenile offender adjudication. Specifically, after determining that respondent received a copy of the State's notice, the court engaged in the following colloquy with respondent:

"THE COURT: Okay. So[,] what [the State's notice is] making an allegation of is that you have priors that make it so that they're asking for an enhanced penalty in this situation if—if their petition was proven.

And what that would mean is that you could be sentenced in [*sic*] a term to DJJ of up to your 21st birthday. You would be able to get day-for-day credit on that, but it would extend that term that you could be sentenced to.

Do you understand that?

RESPONDENT MINOR: Yes.

THE COURT: And it would also trigger some things that would make it so that if you were found guilty[,] any sentence to DJJ could also be mandatory.

Do you understand that?

RESPONDENT MINOR: Yes."

¶ 5 The trial court next admonished respondent regarding his right to a jury trial under the Act. It informed respondent that, because the State sought to have him adjudicated as a habitual juvenile offender, respondent had an "additional right" to request a jury trial. The court further explained the difference between a jury trial and a bench trial. Ultimately, respondent stated he understood the court's admonishments and that he had no questions. Respondent's counsel then stated he needed time to talk with respondent and respondent's mother about respondent's

right to a jury trial. However, counsel also asked the court to tentatively set a jury trial date, which the court did.

¶ 6 On August 13, 2019, respondent filed a "Motion to Suppress Confession," challenging the voluntariness of statements he made during a police interrogation on the basis that he was improperly denied access to his mother, a "concerned adult." He asked the trial court to bar the State from using any incriminating statements he made during the interrogation.

¶ 7 On August 20, 2019, respondent appeared before the trial court and waived his right to a jury trial. The record reflects respondent's counsel informed the court that both respondent and his mother wanted to "waive jury and instead have a bench trial." The following colloquy then occurred between the court and respondent:

"THE COURT: So, *** you've had an opportunity to discuss that with Mr. Feldman [(defense counsel)]?

RESPONDENT MINOR: Yes.

THE COURT: Do you understand the difference between a jury trial and a bench trial?

RESPONDENT MINOR: Yes.

THE COURT: Do you understand also that that's—there's a lot of things that Mr. Feldman decides what to do, there's a lot of, for example, during a trial a lot of calls that he makes if, for example he was going to object to something or not object to something, if he was going to try to put in a particular type of evidence or to call a witness, those are all examples of things that he would get to decide. Hopefully he'd be talking with you beforehand and you'd have an idea of what that was going to be, but there's certain things that you get to decide and one of those is whether or not you have a jury trial or a bench trial on these allegations. So[,] do you understand that that's your decision to make?

RESPONDENT MINOR: Yes.

THE COURT: And that no one can force you to do it as a bench trial instead of a jury trial? Do you understand that?

RESPONDENT MINOR: Yes."

Respondent then denied that any threats or promises had been made to him in exchange for his waiver of his right to a jury trial, and he persisted in his waiver.

¶ 8 On September 20, 2019, the trial court conducted a hearing on respondent's motion to suppress his statements to the police. Several witnesses testified at the hearing, including respondent; Michelle Brown, respondent's mother; Robert Banks Jr., respondent's probation officer; and Paul Jones, the police detective who interviewed respondent. The parties also jointly submitted a recording of Jones's interview with respondent.

¶ 9 Evidence at the hearing showed, on August 4, 2019, the police arrested respondent around 10 p.m. at the McLean County Fair and took him to the Bloomington Police Department. Respondent was placed in an interview room and, ultimately, interviewed by Jones. Before the interview began, Jones introduced respondent to another officer, Officer Miller, and explained that, because respondent was a juvenile, there was "a certain process" that they had "to go through." Jones described the process as "not really that complicated" and stated that Miller was there to read respondent the "juvenile *Miranda* warning." He also stated that Miller was present "to like represent [respondent] or answer any questions" respondent had. Jones

explained that, if there was a problem, respondent could "ask to talk to [Miller] at any[ ]time" and that Miller would "be monitoring the room." Jones told respondent that, if he wanted to speak with Miller, he could "just say hey I want to talk to the juvenile officer." Finally, Jones expressed that they had a lot to do and it should not take that long, but they had to "get through this first."

¶ 10 Miller then spoke and told respondent that he was "just kind of [respondent's] advocate for anything or any questions [he] might have." He stated that he did not "know anything about the case" and had "no bias one way or the other." Miller then read the juvenile *Miranda* warnings to respondent. He explained that respondent had the right to remain silent, meaning he did not have to say anything and that anything he did say could be used against him in court. Miller stated respondent also had the right to "get help from a lawyer" and that the court would get him a lawyer for free if he could not afford one. Finally, respondent was advised that he could ask for a lawyer or to stop the interview at any time. Miller next asked respondent if he wanted to have a lawyer, and respondent indicated that he did not. When Miller asked respondent if he wanted to talk to Jones, respondent stated he wanted to know "what I'm here for."

¶ 11 The record reflects Jones interviewed respondent for approximately one hour. During the interview, respondent made inculpatory statements indicating knowledge of the charged offenses and placing himself at the scene.

¶ 12 Evidence at the suppression hearing also showed that respondent was on probation at the time of the alleged offenses in this case. Banks, respondent's probation officer, testified respondent had 18 prior "police contacts" and had been on probation three times. It was his belief that respondent had "a high level of intelligence." Banks acknowledged that respondent had been held back a couple times in school and was "behind in credits" but stated that was "a different question than [respondent's] intelligence."

¶ 13 Respondent acknowledged having been questioned by the police on unrelated matters in the past and estimated that he had been questioned by the police on at least four prior occasions. He testified those interviews were conducted without the presence of his mother or anyone else. Respondent recalled that, during the interview in question, he was told about his "rights." Specifically, he remembered being told that he had "the right to remain silent," that anything he said could be used against him, and that he "had the right to retain an attorney." Respondent denied that he had "any questions about what those rights were at the time" of the interview.

¶ 14 Brown, respondent's mother, also acknowledged that respondent had been questioned by the police before. She estimated that she had been present on three of those occasions—twice she was in the interview room, and once she was "[s]itting in the lobby." Brown also denied that respondent had any learning disabilities.

¶ 15 On September 26, 2019, the trial court entered a written order denying defendant's motion to suppress. It found "no question" that respondent's August 4 interview with Jones was a "custodial interrogation." However, in denying the motion, the trial court set forth the factors it considered and stated as follows:

> "The Court has considered the background and experience of [respondent] as well as his age. The Court has also considered the conduct and behavior of the parties during the interrogation. Having a parent present for an interrogation, or the opportunity to be present, is a significant factor in whether a statement should be considered involuntary. And it is a factor which this Court also weighs heavily in this decision. However, nearly

every other factor that the Court is considering is either neutral or weighs toward the statement being voluntary."

¶ 16 On September 27, 2019, the State filed a first supplemental petition for adjudication of wardship, alleging M.P. committed three counts of robbery (720 ILCS 5/18-1(a) (West 2018)) arising from the same underlying events as the original petition. It asserted that on or about July 22, 2019, respondent (or one for whom he was legally responsible), knowingly and by the use of force or the threat of force, took money and property from Haywood. Again, the State also filed a notice of intent to prosecute respondent as a habitual juvenile offender under section 5-815 of the Act.

¶ 17 On October 3, 2019, the matter was called for a bench trial. Initially, however, the trial court and the parties addressed the State's recent filings of its first supplemental petition and notice of intent. Respondent's counsel asserted he had informed both respondent and respondent's mother about the notice of intent and told them "to discuss between them what they wished to do." The following colloquy then occurred between the court and respondent:

"THE COURT: I want to make sure, do you understand what that notice is? It is the same as before, the allegations that they want to proceed under. They are giving notice that they are prosecuting under what's numbered [section 5-815 of the Act], alleging that you are a habitual juvenile offender. You need to make sure—I need to make sure that you understand the penalty for that. If you were found—if you were found guilty of the offenses that were alleged, the new ones, and if—the State would then have to prove that. It wouldn't be automatic. The State would have to prove still that you were a habitual offender, a habitual juvenile offender. This is just notice to you that their intent would be to try to prove that up later. If they were successful in proving that up, then at that point any sentence that you had would have to be to DJJ. Do you understand that?

RESPONDENT MINOR: Yes.

THE COURT: So[,] it couldn't be probation or at the juvenile detention center or anything like that. It would have to be in the Department of Juvenile Justice. Do you understand that?

RESPONDENT MINOR: Yes.

THE COURT: Ms. Brown [(respondent's mother)], do you understand that as well?

RESPONDENT MOTHER: Yes."

Both respondent and his mother also asserted that they had an opportunity to discuss the matter with respondent's attorney.

¶ 18 The trial court then admonished respondent regarding his right to a jury trial based on the new charges against him and the accompanying allegation that he was a habitual juvenile offender. Respondent asserted he understood the difference between a jury and a bench trial and that he had a right to a jury trial on the new robbery charges. Further, he stated he had the opportunity to speak with both his mother and his attorney about his rights. Respondent then stated he "want[ed] a bench trial." Upon questioning by the court, he agreed that he was waiving his right to a jury trial and denied that any threats or promises were made to him in exchange for his waiver.

¶ 19 The matter next proceeded with a bench trial. The State's evidence showed that on July 22, 2019, Haywood was looking to purchase 14 grams of marijuana for $100 and contacted an

acquaintance named Javares Hudson through Snapchat. Hudson then contacted another individual through Snapchat regarding Haywood's request, who the State's evidence indicated was 18-year-old Da'Jon Glass. Following that communication, Hudson directed Haywood to a location on Lee Street in Bloomington.

¶ 20 Glass testified at trial under a grant of use immunity and acknowledged that he had been charged with aggravated robbery. Although nothing had been offered to him in exchange for his testimony, he was hoping to get a plea deal from the State. Glass stated on July 22, 2019, he and respondent were together at a friend's house on Lee Street when he received a Snapchat communication from "some dude named JJ." According to Glass, JJ stated, "I have a stain," meaning there was an "opportunity *** to take something from somebody." He testified he told respondent about the "stain." Respondent asserted "he had the right thing for that" and pulled out a gun, which he gave to Glass. Glass and respondent then went outside and saw a car with its engine running. They went up to the car and got in. Glass sat in the front passenger seat, and respondent sat in the back on the passenger side.

¶ 21 The State's evidence showed that Haywood was the driver of the vehicle. Glass testified that Haywood stated he was "trying to get some weed" and handed Glass his money. Glass counted the money and determined there was $100. He told respondent to "give him the weed" because he knew respondent "had a little bit of weed on him." Respondent told Glass to "give [Haywood] the rest of it." Glass testified he pretended like he was "looking for some weed." Then he pointed the gun at Haywood and demanded his "stuff." Glass stated he grabbed Haywood's money and his iPhone. According to Glass, respondent, who was wearing a sling on one of his arms, "choked" Haywood from behind and took a pair of Beats headphones. Glass and respondent then exited the car and returned to their friend's apartment.

¶ 22 The State submitted a 30-second Snapchat video into evidence, which Glass identified. He testified the video was taken after the incident with Haywood and depicted him "[s]howing off the gun" with respondent in the background. He testified that, in the video, he was showing off the same gun he used during the encounter with Haywood. He and respondent were also wearing the same clothing. In the video, the person Glass identified as respondent can be seen wearing a sling.

¶ 23 Haywood testified and described his efforts to buy "weed" on July 22, 2019. He testified he contacted Hudson through Snapchat and was directed to a location on Lee Street. While there, two males approached and entered his vehicle, and one sat in the front passenger seat, and one sat in the back seat. The male in the back seat showed him "weed," and Haywood showed the male in the front seat his money. Haywood testified the male in the front seat pulled out a gun, pointed the gun at his head, and took his money and iPhone. He stated the male in the back seat took his Beats headphones.

¶ 24 Although Haywood had never met the two males before, he did get a good look at them during the incident. After viewing images from the Snapchat video submitted by the State, Haywood identified the individuals depicted in the video as the males who entered his vehicle. He stated the gun in the video was the "gun that was used" during the incident. Haywood testified the male who entered the back seat of his vehicle had been wearing a sling on his right arm. He identified that male as the person in the video wearing the sling, stating "I recognize his sling right away." Haywood denied that the male in the back seat choked him or displayed a gun.

¶ 25    The State's evidence further showed that, after the robbery, Glass visited the residence of Kierra Byrd. Upon leaving Byrd's residence, he mistakenly left the iPhone he took from Haywood behind. Byrd found the iPhone and, the same day, sold it at an "ecoATM" at Walmart. Byrd testified that she received $70 for the iPhone. Detective Jones contacted the company that received the iPhone and was able to obtain the phone and return it to Haywood.

¶ 26    Detective Jones testified that crime scene detectives processed Haywood's vehicle and found fingerprints belonging to Glass and an individual named Malik Matthews. Haywood testified he had given a ride to someone named Malik previously but did not recall Malik's last name.

¶ 27    Finally, at the State's request, a recording of Detective Jones's August 4, 2019, interview with respondent was admitted into evidence. The recording shows respondent told Jones he had been shot on July 12, 2019, and wore a sling on his arm for approximately two weeks thereafter. Jones then questioned respondent regarding his involvement in an incident that occurred approximately two weeks prior to the interview and that involved someone getting things taken from them in a car in the area of Lee Street. Respondent ultimately acknowledged involvement in the incident. He stated that he and an individual whom he would only identify as "JJ" entered a vehicle. JJ entered the front passenger side of the vehicle while respondent entered the rear passenger side. Respondent stated that the driver of the vehicle wanted to buy marijuana. He reported that he took the driver's money, totaling $80 to $100, but did not give the driver anything in return. According to respondent, JJ then told respondent to get out of the car while JJ stayed inside. Respondent exited the vehicle and, after the incident, went home.

¶ 28    The trial court adjudicated respondent delinquent on each robbery count but determined the State failed to prove that he committed the offense of armed robbery as alleged in its original petition. In setting forth its ruling, the court noted that it found parts of Glass's testimony credible and parts of it not credible. The court stated it found Haywood's testimony "to be very credible" and it "believe[d] each part of his testimony."

¶ 29    On October 24, 2019, the trial court conducted respondent's sentencing hearing. At the State's request, the court took judicial notice of respondent's prior delinquency adjudications in two cases. It found that respondent was a habitual juvenile offender as alleged by the State and sentenced him to commitment in the DJJ until his twenty-first birthday.

¶ 30    This appeal followed.

## II. ANALYSIS

### A. Ineffective Assistance of Counsel

¶ 33    On appeal, respondent first argues his attorney was ineffective for failing to seek the suppression of statements he made during his interview with Detective Jones on the basis that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. He contends that Jones and Officer Miller engaged in "misleading tactics" that minimized the importance of the *Miranda* warnings and improperly equated Miller, the juvenile officer, to an attorney. Respondent further contends that, absent the incriminating statements he made during his interview with Jones, there is a reasonable probability that the trial court would have found him not guilty of robbery. He argues that, other than his own incriminating statements, the State "relied substantially on testimony from an adult co-defendant, who provided incredible testimony and was admittedly seeking leniency from the State on his case."

¶ 34    Ineffective-assistance-of-counsel claims are evaluated under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. "Under this test, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

¶ 35    To establish prejudice when an ineffectiveness claim is based on counsel's failure to file a suppression motion, "the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.* ¶ 15. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526. In the context of prejudice, "a 'reasonable probability' is defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *Id.*

¶ 36    "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Henderson*, 2013 IL 114040, ¶ 11. Further, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, *** that course should be followed." *Id.*; see also *People v. Hale*, 2013 IL 113140, ¶ 17, 996 N.E.2d 607 (acknowledging that a court "may dispose of an ineffective[-]assistance[-]of[-]counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance").

¶ 37    Here, it is unnecessary to address the performance prong of respondent's ineffective-assistance-of-counsel claim, as we find he cannot establish prejudice. In other words, even assuming respondent's counsel was ineffective for failing to move to suppress his statements to Detective Jones on the basis that his *Miranda* waiver was invalid and that such a motion would have been granted if filed, the record reflects no reasonable probability that respondent would have been found not guilty at his trial.

¶ 38    Here, excluding respondent's statements to Jones, the State presented evidence that Haywood was robbed at gunpoint by two males while attempting to purchase marijuana on Lee Street in Bloomington. Evidence established that the two males who robbed Haywood were Glass and respondent. Glass testified under a grant of use immunity that he and respondent were involved in the robbery, and Glass's fingerprints were found inside Haywood's vehicle. The State also submitted a 30-second Snapchat video, which Glass testified was taken after the robbery and which depicted him showing off the gun that was used in the incident with respondent in the background. Further, Haywood testified at trial that, although he did not know the males who robbed him, he was "able to get a good look at them." When shown images from the Snapchat video, Haywood identified the individuals in the video as the ones who robbed him and identified the gun as the one used during the robbery. He testified he was able to identify the male in the video who was in the back seat of his vehicle and noted that he "recognize[d] his sling right away."

¶ 39    As stated, respondent argues that, absent his recorded statements, the State's case was weak because it relied primarily on Glass, who was hoping to obtain leniency in his own case and whose testimony was not credible. However, the record shows the trial court found portions of

Glass's testimony credible and that Haywood's testimony was "very credible." Notably, Glass's testimony was largely consistent with Haywood's testimony regarding the circumstances of the incident. Both testified similarly regarding the positioning of the individuals in Haywood's car and their appearance and actions. Both Haywood and Glass testified that the front seat passenger (Glass) counted Haywood's money, produced the gun, and took Haywood's money and iPhone. Both also asserted that the male in the back seat (respondent) wore a sling, had "weed" in his possession, and took Haywood's Beats headphones. The Snapchat video further supported Glass's testimony, in that it depicted him with a gun and in the company of respondent who was wearing a sling. As stated, Haywood was also able to identify both the gun and his assailants from that video.

¶ 40 Further, we note that, in setting forth its ruling, the trial court made no mention of respondent's inculpatory statements, suggesting they were not a significant factor in its finding of delinquency. Instead, the court's comments indicate it relied most heavily on the testimony from Glass and Haywood, as well as the Snapchat video.

¶ 41 Given the circumstances presented, we find respondent has failed to make a showing sufficient to undermine the outcome of his bench trial. Thus, because no reasonable probability exists that he would have been found not guilty of robbery if his statements to Detective Jones had been suppressed, he cannot establish that his counsel provided ineffective assistance.

¶ 42                                    B. Jury Waiver

¶ 43 On appeal, respondent next argues that he did not knowingly waive his right to a jury trial because he was improperly admonished regarding the penalties of an adjudication as a habitual juvenile offender. Specifically, he complains that the trial court failed to inform him that, upon adjudication as a habitual juvenile offender, he faced mandatory commitment to the DJJ until his twenty-first birthday. Respondent acknowledges that he forfeited this issue by failing to raise it with the trial court but asks this court to review his claim under the plain-error doctrine.

¶ 44 A defendant forfeits an issue for purposes of appellate review by failing to object to the alleged error or raise it in a written posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. Nevertheless, this court may excuse a party's forfeiture under the plain-error doctrine in two instances:

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.*

¶ 45 Under either plain-error prong, the initial step is to determine whether a clear or obvious error occurred. *Id.* ¶ 49. An alleged error is not clear or obvious if it concerns "merely arguable issues." *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17, 138 N.E.3d 31. Instead, the error must "be manifest or patent." *Id.* Further, "[p]lain-error review is reserved for errors that are clear or obvious based on law that is well settled at the time of trial." (Internal quotation marks omitted.) *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11, 33 N.E.3d 608.

¶ 46 Relevant to this appeal, the Act provides for circumstances in which a delinquent minor may be adjudged a habitual juvenile offender. 705 ILCS 405/5-815(a) (West 2018). Where

such an adjudication is made, the court is required to order the minor committed to the DJJ "until his 21st birthday, without possibility of aftercare release, furlough, or non-emergency authorized absence." *Id.* § 5-815(f). However, a minor is entitled to receive good conduct credits that may reduce his period of confinement. *Id.* Additionally, the Act provides that, when the State seeks to prosecute a minor as a habitual juvenile offender, "[t]rial *** shall be by jury unless the minor demands, in open court and with advice of counsel, a trial by the court without jury." *Id.* § 5-815(d).

¶ 47 In the adult criminal context, the right to a jury trial is a fundamental right guaranteed by the state and federal constitutions. *People v. Bannister*, 232 Ill. 2d 52, 65, 902 N.E.2d 571, 581 (2008). A defendant may waive his or her right to a jury trial, but to be valid, the waiver must be knowing and voluntary. *Id.* A trial court has a "duty of ensuring that a defendant waives the right to a jury trial expressly and understandingly." *Id.* at 66. However, the court is not required to "give any specific admonition or advice for a defendant to make an effective jury waiver." *Id.* Further, "[w]hether a jury waiver is valid cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each case." *People v. Bracey*, 213 Ill. 2d 265, 269, 821 N.E.2d 253, 256 (2004). "Generally, a jury waiver is valid if it is made by defense counsel in defendant's presence in open court, without an objection by defendant." *Id.* at 270.

¶ 48 Here, the record reflects a valid jury waiver by respondent when his case is analyzed under the above principles. Specifically, respondent appeared in court with his counsel, and the trial court twice admonished him regarding his right to a jury trial. In connection with the State's original petition and notice of intent to prosecute respondent as a habitual juvenile offender, the court explained to respondent the difference between a jury trial and a bench trial, and respondent asserted that he understood the court's admonishments and had no questions. Respondent's counsel also indicated that he intended to further discuss respondent's right to a jury trial with both respondent and respondent's mother. At a later date, respondent appeared in court, and his counsel represented that both respondent and respondent's mother wanted to "waive jury" and proceed with a bench trial. Upon questioning by the court, respondent asserted that he had discussed the issue with his counsel, he understood the difference between a bench and a jury trial, and he understood that whether to have a jury trial was his decision to make and that he could not be forced to have a bench trial instead of a jury trial.

¶ 49 In connection with the State's supplemental petition and second notice of intent to prosecute respondent as a habitual juvenile offender, respondent was, again, questioned by the trial court and stated he understood the difference between a bench and a jury trial. He also expressed that he understood that he had a right to a jury trial on his new charges and asserted that he had the opportunity to speak to both his attorney and his mother about his rights. Respondent explicitly stated he "want[ed] a bench trial." Upon questioning by the court, he denied that any threats or promises had been made to him in exchange for his waiver.

¶ 50 On review, respondent argues that, as a juvenile offender with a statutory right to a jury trial, he was entitled to receive additional admonishments from the trial court prior to waiving his right to a jury trial, *i.e.*, admonishments that he faced a mandatory determinate sentence if adjudicated a habitual juvenile offender. We note, however, that the Act sets forth no explicit admonishments that the trial court must give a juvenile offender prior to a waiver of his or her right to a jury trial. Additionally, respondent cites no case authority that would require any particular admonishments, and our research reveals none.

¶ 51　　Instead, we find that relevant case authority supports the State's position that we should rely on settled precedent in adult criminal proceedings when analyzing the jury-waiver issue. Specifically, we note the supreme court's decision in *In re R.A.B.*, 197 Ill. 2d 358, 757 N.E.2d 887 (2001), *abrogated on other grounds by In re Destiny P.*, 2017 IL 120796, 102 N.E.3d 149. There, the State charged the 16-year-old respondent with the offense of robbery and sought to have him adjudicated as a violent juvenile offender. *Id.* at 359-62. Like this case, the State's decision to seek a violent juvenile offender adjudication triggered the respondent's right to a jury trial. *Id.* at 363 (citing 705 ILCS 405/5-36(d) (West 1996)). Although the respondent had the right to a jury trial, his case proceeded with a stipulated bench trial, and he was adjudicated both delinquent and a violent juvenile offender. *Id.* at 362.

¶ 52　　The respondent appealed, arguing he did not knowingly waive his right to a jury trial. *Id.* In considering the issue on review, the supreme court looked to the same legal principles utilized for determining whether the jury waiver of an adult criminal defendant was valid. *Id.* at 364. The court explicitly noted that "[n]o specific admonition or advice is required before an effective jury wavier may be made." *Id.* (citing *People v. Tooles*, 177 Ill. 2d 462, 469, 687 N.E.2d 48, 51 (1997)). Ultimately, the court determined the respondent in the case before it had not validly waived his right to a jury trial because he "was not informed in open court of his right." *Id.* at 368.

¶ 53　　As indicated, *R.A.B.* was abrogated on other grounds by the supreme court's decision in *Destiny P.*, 2017 IL 120796, ¶ 14 n.1, on the basis that it incorrectly referred to a juvenile's right to a jury trial as a fundamental right when the source of that right is statutory and not constitutional. Nevertheless, we find *R.A.B.* is instructive in that it sets forth the manner in which to review an invalid-jury-waiver claim in a juvenile delinquency case. Significantly, that portion of the court's decision was not nullified by subsequent case authority. Accordingly, we find the same analysis utilized by the supreme court in *R.A.B.* should be employed when evaluating respondent's claim, *i.e.*, the same analysis employed in adult criminal cases. As discussed above, under that analysis, respondent's jury waiver was valid.

¶ 54　　Respondent further argues that, because the source of the right to a jury trial for juvenile offenders comes from a statutory provision that also contains a specific and mandatory sentencing provision, different treatment for juveniles is warranted when it comes to jury trial waivers. Specifically, he asserts as follows:

> "In other words, a criminal defendant's sentence is in no way relevant to his or her fundamental right to a jury trial (which is why there is no sentencing admonishment), whereas a juvenile respondent's mandatory determinate sentence to DJJ is inextricably linked to his or her statutory right to a jury trial."

Respondent maintains it is that "inextricable link" that warrants sentencing admonishments for juvenile offenders who waive their right to a jury trial and not adult defendants.

¶ 55　　We disagree. The reason that section 5-815 of the Act provides for the right of a jury trial to a minor who is subject to prosecution as a habitual juvenile offender is because such an adjudication involves "severe deprivations of liberty" akin to those in adult criminal proceedings. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 205, 909 N.E.2d 783, 798 (2009); see also *Destiny P.*, 2017 IL 120796, ¶ 18 ("The legislature, in dealing with offenders who have gained little from the juvenile justice system's rehabilitative aims, has made [habitual juvenile offender] and [violent juvenile offender] proceedings more like criminal proceedings and has afforded this class of juveniles a jury trial right."). Additionally, the

penalties and consequences associated with a finding of guilt for an adult offender are also closely connected with the right to a jury trial. See *McKeiver v. Pennsylvania*, 403 U.S. 528, 551 (1971) (White, J., concurring) (stating "the consequences of criminal guilt are so severe that the Constitution mandates a jury to prevent abuses of official power by insuring, where demanded, community participation in imposing serious deprivations of liberty and to provide a hedge against corrupt, biased, or political justice"); *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968) (stating "the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the [jury trial provision of the] Sixth Amendment").

¶ 56 Accordingly, we find respondent was not entitled to receive any specific admonition regarding the penalties of an adjudication as a habitual juvenile offender from the trial court before making an effective jury waiver. Thus, because the record reflects a valid jury trial waiver by respondent in this case, no clear or obvious error occurred.

¶ 57                               III. CONCLUSION
¶ 58 For the reasons stated, we affirm the trial court's judgment.

¶ 59 Affirmed.